## UNITED STATES v. EIGHTY-SEVEN BARRELS, ETC., OF WINE.  SAME v. SIXTY BARRELS OF WINE, ETC.  SAME v. SIXTY-TWO BARRELS OF WINE.

(District Court, D. Vermont.  June 24, 1910.)

Nos. 26, 27, 28.

INTOXICATING LIQUORS (§ 138*)—SHIPMENT—INTERSTATE COMMERCE—STATUTES —"CONSIGNEE."

Cr. Code, § 240 (Act Cong. March 4, 1909, c. 321, 35 Stat. 1137 [U. S. Comp. St. Supp. 1909, p. 1464]), provides that whoever shall knowingly ship from one state into another any package containing intoxicating liquor, unless the package be so labeled on the outside cover as to plainly show the name of the consignee, the nature of the contents, and the quantity contained therein, shall be fined and the liquor forfeited.  *Held*, that the term "consignee" was so used in its primary legal sense to describe the person to whom the liquor was to be delivered at destination in accordance with the contract of carriage, and hence where wholesale merchants in California, after collecting enough orders from purchasers in New England to make car load shipments, labeled each package with its own name, the character and quantity of the liquor, and the name of the purchaser, and consigned the entire car to itself or to its own order with directions to the carrier to notify designated persons, the shipper was also the consignee within the statute; the names of the purchasers being regarded as surplusage, so that there was no violation of the act.

[Ed. Note.—For other cases, see Intoxicating Liquors, Dec. Dig. § 138.* For other definitions, see Words and Phrases, vol. 2, pp. 1449, 1450.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Libels of information by the United States for the condemnation and forfeiture of certain barrels of wine, under Cr. Code U. S. § 240, approved by Act March 4, 1909, c. 321, 35 Stat. 1137 (U. S. Comp. St. Supp. 1909, p. 1464). Dismissed.

William A. Lord and S. Hollister Jackson, for claimants.

Alexander Dunnett, U. S. Atty.

HOUGH, District Judge. The section of the Criminal Code upon which these actions are based is (in its material parts) as follows:

"Sec. 240. Whoever shall knowingly ship * * * from one state * * * into any other state * * * any package of or package containing any * * * intoxicating liquor of any kind, unless such package be so labeled on the outside cover as to plainly show the name of the consignee, the nature of its contents and the quantity contained therein, shall be fined not more than $5,000; and such liquor shall be forfeited to the United States and may be seized and condemned by like proceedings as those provided by law for the seizure and forfeiture of property imported into the United States contrary to law." Act March 4, 1909, c. 321, 35 Stat. 1137 (U. S. Comp. St. Supp. 1909, p. 1464).

The two preceding sections of the Code, however, relate to the same legislative subject. Section 238 renders it criminal for "any officer, agent or employé of any * * * common carrier" to knowingly deliver to "any person other than the person to whom it has been consigned (unless upon the written order in each instance of the bona fide consignee) or to any fictitious person, or to any person under a fictitious name," any intoxicating liquor arriving at its place of destination by interstate or international transportation; and section 239 renders it criminal for any common carrier transporting or delivering liquor after interstate or international transportation to "collect the purchase price or any part thereof," or "in any manner act as the agent of the buyer or seller of any such liquor, for the purpose of buying or selling or completing the sale thereof, saving only in the actual transportation and delivery of the same."

As these three sections of the Code are (unlike most of that act) new legislation—and new not only in words but new in treatment of the subject-matter—their history may be appropriately considered in order to ascertain something of congressional intent.

During the Sixtieth Congress there were pending in the Senate at least seven bills intended to regulate commerce in such manner as to aid the "Prohibition" legislation of any state or territory. There were also at least two such bills introduced into the House of Representatives. Generally speaking, the Senate bills sought to accomplish their object by subjecting interstate and international shipments of liquor to the police power of the several states while still in transit or before final delivery by the carrier. In April, 1908, these proposals were the subject of an interesting and careful report by the Committee on the Judiciary (Senate Report No. 499 Sixtieth Congress). In that report the committee states the mischief (to the correction of which the proposed legislation was directed) to be "the misuse of the facilities furnished by railroad companies, express companies, and other common carriers in bringing in liquors from outside the states

to be paid for on delivery." That this mischief deserved correction the committee agreed; but, for constitutional reasons ably set forth in the opinions (embodied in the report) of Senators Rayner and Knox, it was deemed improper to recommend legislation in apparent conflict with the views regarding liquor shipments expressed in Vance v. Vandercook Co., 170 U. S. 452, 18 Sup. Ct. 674, 42 L. Ed. 1100.

The committee therefore reported to the Senate a bill framed by it (Sixtieth Congress, Senate 6576). This, usually called the "Knox bill," contained three paragraphs corresponding in substance to sections 238-240 of the Criminal Code. The only substantial differences between the third section thereof and section 240 aforesaid is the insertion of the word "knowingly" before the word "unlawful" at the beginning of the section, and the requirement that each package shall not only be so labeled as to show the nature of its contents and the quantity contained therein, but also the name of the consignee. The changes just noted, and especially the requirement concerning the name of the consignee, are plainly in furtherance of the object looked upon with approval by the Senate Committee, viz.:

"That by requiring that all interstate shipments of liquor shall be plainly marked as to their contents, the (Knox) bill will enable the several states to trace and to control the disposition and use of such liquors under their own police powers."

The Criminal Code during its passage through the House of Representatives was amended by adding thereto what are now sections 238–240, being the substance of the Knox bill as enlarged in the House, and the new legislation in question was retained by the Conference Committee without any debate on the floor of either House so far as I can discover. Cong. Rec. March 3, 1909, vol. 43, p. 3791.

This history of legislation shows plainly that the object of the promoters of the bill was to restrict common carriers to the business of transportation only, so far as liquor is concerned, and to produce on the records of the delivering carrier evidence procurable by lawful subpœna of the identity of the recipient of any package containing liquor, which last result was thought to be attained by the requirement of section 238 that delivery should be made only to the consignee "unless upon the written order in each instance of the bona fide consignee," and by the further requirement of section 240 that any package delivered should bear upon it a description of the kind and quantity of its contents and "the name of the consignee."

It is observable that nowhere in these sections is the word "owner" or "purchaser" used. The requirement is not that the liquor package shall bear upon its exterior the name of the person buying or paying for it, or owning it or intending to consume its contents. The language is always that the package shall be delivered to "the person to whom it has been consigned," and that it shall be labeled with "the name of the consignee," and section 238 clearly recognizes the possibility and propriety of a transfer of title by authorizing delivery upon the written order of the consignee.

In the presentation of these cases no question has been made as to the form of proceeding or the method or manner of pleading. It has

been assumed that the shipments about to be considered were "knowingly" made, and the sole point submitted for consideration is whether the facts agreed upon show that the marking, labeling, or consigning of the liquor in question do or do not fall within the condemnation of the statute.

The stipulations on file show that at divers places in Vermont and one in New Hampshire reside various persons who wished to procure barrels of wine or kegs of brandy. These persons ordered the same from the Oliveto Wine Company or the Ciocca Lombardi Company, wine merchants of San Francisco, Cal. These companies permitted orders to accumulate, until the quantity so ordered was sufficient to load three freight cars—a procedure permitting the vendors to obtain "car load rates" on their shipments and save very considerable expense. The Oliveto Company accordingly shipped one car load from its California vinery to Barre, Vt., which car contained the number of barrels and kegs ordered from it by upwards of 80 different persons residing as aforesaid.

The Ciocca Company likewise shipped two car loads of wine, each containing the aggregate orders of an even larger number of customers.

For each one of the cars so loaded and shipped the shipper took out one bill of lading. In the case of the Oliveto Company the bill was "straight"; that is, it recites the receipt from said Oliveto Company of "one car load of wine" consisting of 87 barrels and 2 kegs "consigned to Oliveto Wine Company, Barre, Vt." The bill of lading is in terms "nonnegotiable," and at the foot thereof is written:

"Please deliver the car wine to Enrico Rulfo and oblige.
                    "Respectfully,
                                "Oliveto Wine Company."

Rulfo lived at Barre, and had ordered a single barrel, which was on the car.

Both bills of lading taken out by the Ciocca Company are "order" bills; that is, they acknowledge receipt from the vendor and shipper of a specified number of barrels and kegs of wine and brandy in certain cars; one of which is "consigned to order of Ciocca Lombardi Company destination Barre, Vt., Notify G. Moruzzi at Barre, Vt." And the other similarly consigned, except that the party to be notified is A. Sassorossi. Both persons to be notified had ordered small quantities of wine, which were parts of the several shipments.

Each barrel and keg of this liquor bore upon it a statement of the nature of the spirits contained therein, the quantity thereof, the name of the Oliveto or Ciocca Company (as the case might be), and the name of the person who had ordered it and for whom it was ultimately intended.

The bill of lading issued for each car declared the name of the shipping corporation and set forth that the contents of the car were to be delivered (in one instance) to the Oliveto Company itself and (in the other two instances) to the order of the Ciocca Company. The manifesting or freight records of the various railroads over which these cars passed followed the bills of lading, and showed in each

instance that a car load of wine was deliverable to a certain corporation or its order (as the case might be) at a place in Vermont.

The names of the ultimate consumers, or customers of the wine companies, were never brought to the carrier's attention, or made a matter of record by any carrier, except that Rulfo when he exhibited the Oliveto Company's bill of lading to the station agent at Barre showed him also a list of the customers (corresponding to the names on the barrels and kegs) pinned to the bill.

There being nothing in the act prohibiting bulk shipments, and nothing requiring liquors to be always delivered to the owner or purchaser or consumer (as such), it seems to me that this record was perfect, and that not only was the letter but the spirit of the legislation lived up to, unless the shipper, whose name was on each package, cannot be regarded as the consignee of the contents of the cars in question, or unless it is necessary for the vendor of liquor to ship in the name of his vendee, and such are the contentions of the government. It becomes necessary, therefore, to ascertain in what sense the word "consignee" is used in this statute.

There being no statutory definition of the word contained in the act itself, it must be assumed that Congress used it in its ordinary commercial and legal signification.

In California, where this shipment originated, it is declared by statute that a "consignee" is "the person to whom freight is to be delivered." Civ. Code 1906, § 2110. And this definition, which is plainly intended to be no more than a declaration of existing law and usage, has been carried into the Codes of Montana, Oklahoma, and North and South Dakota. It is undoubtedly true that a consignee is often a purchaser; but it is not necessary that he should have any interest in the goods consigned to him. As long ago as 1798 the Court of Common Pleas, per Buller, J., inquired, "What is a consignee?" and answered the question as follows:

"Consignee is a person residing at the port of delivery to whom the goods are to be delivered when they arrive there." Wolf v. Horncastle, 1 Bos. & Pul. 322.

In Gillespie v. Winberg, 4 Daly (N. Y.) at 320, the Common Pleas of New York City said:

"Consignor and consignee in the ordinary mercantile acceptation of these words signifies the shipper of merchandise and the person to whom it is addressed. To consign in the mercantile law is ordinarily to send or transmit goods to a merchant or factor for sale, and a consignee is consequently the person to whom they are consigned, shipped or otherwise transmitted."

In Lyon v. Alvord, 18 Conn. 66, the Supreme Court of that state, in considering a declaration in assumpsit to recover the expense of saving from sea peril certain goods alleged to be "consigned to the defendant," remarked:

"Counsel have attempted to show that the import of the language of the count is that the defendant was the owner (of said goods); and it is said that the term 'consignee' is often used as synonymous with 'owner.' We are not aware of any such use of the term, much less that such is the fair import of it. That a man may be and often is both consignee and owner of goods cannot be questioned, but still all that is meant by the term is one to whom

goods are consigned; and so far from any necessary or even natural inference· arising from its use that the consignee is in fact owner, it is believed that the· consignor is as often the owner of the goods consigned as that the consignee· is.   The term is nearly synonymous with 'factor,' a person to whom goods· are sent for sale or safe-keeping."

, It is said in Memphis & L. R. R. Co. v. Freed, 38 Ark. 622, that:

"When the terms 'consignor' and 'consignee' are used, by the former is· meant a vendor who ships, and by the latter a purchaser to whom they have· been sent."

But the court in that case was considering the right of stoppage in· transitu, so that, while the statement is correct in respect of the matter under consideration, it cannot be accepted as a general commercial: definition of the word "consignee."

It therefore seems plain that "consignee" as used in this statute· must be taken in its ordinary signification, and to mean that person, or corporation to whom the carrier may lawfully make delivery of the consigned goods in accordance with its contract of carriage.   Such deliveree may or may not be the owner; he may be a mere bailee,. gratuitous or otherwise, a vendee, a commission merchant, or a mere· agent of the shipper; and he may even be a swindler, who had deceived the shipper or consignor into sending him goods to which he· can assert no legal or equitable title or interest whatever.   In determining who is a consignee the question is not in the first instance to· ascertain the contractual relations or lack of them between the person. shipping the goods and the person entitled to receive them, but to· correctly interpret the contract of carriage made by the shipper with the carrier.

That the real owner of the goods may at any time lawfully assert his title thereto is unimportant, for whether such title be asserted by a stoppage in transitu, or a demand followed by an action in trover and conversion (Bliven v. Hudson River R. R. Co., 36 N. Y. 403; Lester v. Delaware, etc., R. R. Co., 92 Hun, 342, 36 N. Y. Supp. 907),. the success of the stoppage notice or the action in conversion rests, not upon the contract of carriage, but upon the rescission or setting aside thereof by higher right.

In the case of the Oliveto Company the bill of lading was "straight"; that is, it was specifically agreed between shipper and carrier that it was not negotiable.

The request of the shipper to deliver the car to Enrico Rulfo (above set forth) is a written order within the language of section 239, but it was not (in the absence of any statute on the subject) such a transfer of the bill of lading or of the goods described therein as to oblige· the delivering carrier to hand over the contents of the car to Rulfo· if it was not thought safe so to do either out of distrust or for fear of violating any of the statutes now under consideration.

The test is whether Rulfo could have maintained an action upon the· bill of lading in his own name by virtue of the request aforesaid.. That he could not do so at common law is too plain for argument.   It required the bills of lading act of 1855 (18 and 19 Victoria, c. 111) to· render any bill of lading in Great Britain capable of even quasi negotiability, and no more than that has been recognized in the United

States, where, as said by Fuller, C. J., in Friedlander v. Railroad Co., 130 U. S. 416, 9 Sup. Ct. 570, 32 L. Ed. 991:

Bills of lading "are regarded as so much * * * articles of merchandise, in that they are symbols of ownership of the goods they cover. * * * While not negotiable as commercial paper is, bills of lading are commonly used as security for loans and advances; but it is only as evidence of ownership special or general of the property mentioned in them and of the right to receive such property at the place of delivery."

No such quasi negotiability can attach to a bill nonnegotiable by agreement.

Both of the shipments by the Ciocca Company were under order bills; that is, the shipping instruments themselves contained an agreement that the fullest measure of negotiability recognized by law was to be given the bills of lading in question. The fact that the delivering carrier was directed to notify a resident of Barre of the arrival of the cars does not make the person to be notified either the consignee of the goods or the agent of the shipper—for any other purpose than that of receiving the notice. As was said in Furman v. Union Pacific R. R. Co., 106 N. Y. 579, 13 N. E. 587:

"The very presence of the word 'notify' * * * shows that (the persons to be notified) are not intended as the consignees; if they are, the word is wholly unnecessary * * * and to place in the bill of lading a direction to notify certain persons to whom if consignees it was the carrier's duty to deliver, or at least to notify of the arrival of the goods, is a plain notice that (in the absence of further directions) they are not the consignees."

And the same doctrine is more concisely put in Joslyn v. Grand Trunk Ry., 51 Vt. 95. In that case certain corn was shipped "by Nutting & Co. to Island Pond to their own order with directions to the defendant (railroad company) to notify J. C. Page." The railroad company "treated Page as the consignee and delivered" the goods to his teamsters. The court continued:

"This was a delivery to the wrong person which rendered the defendant liable for the value of the corn to the owner thereof unless such owner's conduct had induced the misdelivery by the defendant."

And this must follow from the very nature of a bill of lading, for, as asked by Redfield, C. J., in Davis v. Bradley, 28 Vt. 124, 65 Am. Dec. 226, what is a bill of lading?

"It seems to be nothing more than an acknowledgment that the goods are put on board the ship at one port to be delivered to A. B. at another port or to his assigns. * * * The consignor may if he choose take the bill of lading in his own name, and he can then indorse it. But unless he restricts the consignment to be delivered for his own use the consignee is the party entitled prima facie to control the delivery and the title."

Who therefore is entitled under the law merchant to "control the delivery and the title of goods in the possession of a common carrier? Evidently the consignee, and it is one of the tests of his position as consignee that he is so entitled, and no one can be more absolutely so entitled than the shipper named as consignee in a "straight" bill, or the original holder of a negotiable bill with lawful right to indorse the same.

I am therefore of opinion that the Ciocca Lombardi Company was the consignee as well as the consignor of the goods shipped by them. If they had indorsed and delivered their negotiable bills of lading, the lawful indorsee or subsequent holder of said bills would have become the owner of the goods covered by them, and the indorsement would have been a written request within section 239; so that the transaction would have been lawful, although there is no evidence that in this case such a course was pursued.

Quite as plainly was the Oliveto Company the consignee of the goods shipped by them.

As therefore it appears by stipulation that every package contained in each one of the cars referred to was labeled with the name of the consignee (i. e., the Oliveto Company or the Ciocca Company, as the case required), as well as with the other information demanded by section 240, I think the goods in question are not subject to forfeiture.

The inscription upon the several barrels and kegs of the names of those persons who had ordered the wine from the shippers was mere surplusage, for there is nothing in the statute to prevent the addition of any legend to a barrel of wine as long as the description, the quantity, and the name of the consignee be stated thereon.

The informations are severally dismissed.